Filed 1/11/24  P. v. Martinez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT ANTHONY MARTINEZ,<br><br>    Defendant and Appellant. | F085298<br><br>(Super. Ct. No. RF008825A)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING** |

It is ordered that the opinion filed herein on December 22, 2023, be modified as follows:

On page 26, prior to the Disposition, the following paragraphs are inserted.

Anticipating forfeiture, appellant argues counsel was ineffective in failing to request the restitution fine be stayed and the assessment fees stricken based on his inability to pay.

To establish ineffective assistance of counsel, "the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1006 (*Mai*); see *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)

The record here does not explain why appellant's counsel did not object to the imposed restitution fine and fees. However, we do not identify any potential ineffective assistance of counsel on this issue as nothing in appellant's record indicates he did not have the ability to pay, either through prison wages or future earnings. Appellant's probation report indicates that, just prior to his arrest, he was working for a private company doing cement work and earning $380 to $400 a week, and earlier worked as a field laborer for $650 to $700 per week. (See, e.g., *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060-1061 [ability to pay fines includes consideration of wages appellant may earn in prison]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [trial court may consider a defendant's future ability to pay in determining whether a defendant has the ability to pay a restitution fine].) The total fee and fines imposed was $510 and appellant's trial counsel may have concluded that objecting to this amount would have been pointless.

Appellant fails to meet his burden to demonstrate counsel had no tactical purpose for failing to request the restitution fine be stayed and the assessments stricken based on his inability to pay. Furthermore, even if counsel's performance was deficient or counsel had objected to the imposed fine and fees and the trial court held an ability-to-pay hearing, appellant cannot establish he was prejudiced. As noted above, a trial court may consider the wages a defendant could earn in prison in determining an ability to pay under *Duenas* (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1101.) Just because it may take many years to earn the amount owed in fees and fines with prison wages or future wages upon release from prison does not mean a defendant lacks the ability to pay under *Duenas.* (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1077.)

Appellant has not shown that there is a reasonable probability that, had trial counsel objected to the imposed fine and fees based on his inability to pay or requested the court to make an ability-to-pay finding under *Duenas*, it would not have imposed the restitution fine and assessments. Substantial evidence supports the court's implicit determination that appellant would be able to pay the $300 restitution fine and $210 in assessments with wages he could earn during the lengthy 29-years-to-life prison term imposed in this case or from future wages upon his release from prison. (See *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [failure to challenge fees under *Duenas* is harmless where defendant can earn the $370 in fees owed during his eight-year prison term].) Because appellant has not shown that he was prejudiced by trial counsel's failure to raise the *Duenas* issue, he cannot show he was denied effective assistance of counsel.

There is no change in the judgment. Appellant's petition for rehearing filed on December 27, 2023, is denied.

FRANSON, J.

WE CONCUR:

DETJEN, ACTING P. J.

SMITH, J.

Filed 12/22/23  P. v. Martinez CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANTHONY MARTINEZ,<br><br>Defendant and Appellant. | F085298<br><br>(Super. Ct. No. RF008825A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Carly Orozco, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Robert Anthony Martinez was charged by amended information, in count 1, with first degree attempted murder (Pen. Code, §§ 187, subd. (a), 189, 664)[1]; in

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

count 2, with assault with a deadly weapon (§ 245, subd. (a)(1)); and in count 3, with battery with serious bodily injury (§ 243, subd. (d)). As to each count, it was also alleged appellant personally used a deadly weapon (§ 12022, subd. (b)(1)) and that appellant personally inflicted great bodily injury (§ 12022.7, subd. (a)). It was further alleged appellant had two prior strike convictions (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), both of which were serious felonies (§ 667, subd. (a)).

A jury found appellant not guilty on count 1 first degree attempted murder, but guilty of the lesser included offense of attempted voluntary manslaughter (§§ 192, subd. (a), 664), and guilty on counts 2 and 3. As to each of the three counts, the jury found true the allegations for personal use of a deadly weapon and personal infliction of great bodily injury.

In a bifurcated proceeding, the jury found true that appellant had suffered two prior strike convictions, which were also serious felonies.

The trial court sentenced appellant to 29 years to life, consisting of a third-strike sentence of 25 years to life for count 1; one year for the deadly weapon enhancement (§ 12022, subd. (b)(1)); and three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). Sentence on counts 2 and 3 were stayed pursuant to section 654. The two prior serious felony enhancements (§ 667, subd. (a)) were struck pursuant to section 1385. Fines and fees totaling $510 were imposed.

On appeal, appellant argues: (1) the trial court erred in failing to instruct on self-defense (defense of others); (2) appellant's conviction on counts 2 and 3 violate section 954; (3) the trial court erred in failing to dismiss all enhancements beyond single enhancement pursuant to section 1385, subdivision (c)(2)(B) (hereafter § 1385(c)(2)(B)); (4) and appellant's restitution fine should be vacated because it was imposed without a determination of an ability to pay. We affirm.

2.

## STATEMENT OF THE FACTS

Very early one morning in October 2021, Zachary Getchey offered to take his friend Isaias Barragan to Emma Fearn's home. Barragan and Fearn were in a romantic relationship. Fearn lived a few minutes away from Getchey, in an apartment unit facing an alley with a small front yard fenced in by a high fence.

Shortly before Getchey and Barragan arrived at Fearn's, Juan Aldana knocked on Fearn's door and asked for a cigarette and whether anyone was coming to her house. Fearn thought this was strange, as she did not know Aldana well, although he was Barragan's friend.

Getchey and Barragan then arrived at Fearn's, and Aldana immediately ran to the side of Fearn's house. Fearn also noticed two other men outside her house, appellant and Patrick Hull. Fearn described a "lot of yelling going on, and you could tell that there was about to be a physical altercation," with Getchey and Barragan on one "side" of the argument and appellant, Aldana and Hull on the other.

Getchey saw a "conflict" with Barragan against Aldana, Hull and appellant. Getchey knew all of them since childhood. Getchey assumed Hull arrived at Fearn's house "to fight." Fearn did not see Getchey provoke or instigate a fight. Getchey tried to intervene in the fight that ensued. Appellant told him to "stay out of it" and tried to "go around" Getchey to continue fighting. Getchey tried to protect Barragan from getting "stabbed or jumped" and admitted that he testified at the preliminary hearing that he "ended up getting stabbed for trying to stop that." Getchey testified that his recollection of the events was based on "what everybody told [him]" as he had been drinking alcohol and had taken drugs.

Fearn went into her house and emerged with a bat, fearing for her and Barragan's safety. When she emerged from the house, Hull was directly in front of her door, and she hit him with the bat. Barragan and Hull then started fighting. Barragan took the bat from

Fearn, and Barragan then fell on the ground. Hull landed on top of him. In the meantime, appellant and Getchey were "fighting or arguing and fighting."

Fearn saw appellant with a knife, and she started yelling that she was going to call the police. The knife worried Fearn, as she knew the knife could "kill … or hurt someone." When Fearn yelled that she was going to call the police, everyone else ran outside the fence. Fearn then ran towards the group and saw Getchey holding his side saying he had been stabbed. He was bleeding profusely.

Appellant, Hull, and Aldana left in a vehicle, and Fearn and Barragan started arguing. Getchey got into the car he arrived in and drove to his girlfriend Desiree Mendiola's apartment, where he told her appellant had stabbed him. Mendiola saw Getchey's sweatpants were completely soaked in blood, and he was pale. Mendiola rushed to take Getchey to the hospital, but was pulled over.

During the traffic stop, Getchey got out of the vehicle and one of the officers applied trauma dressing. Getchey had a two-inch wound below his left armpit. Getchey was initially uncooperative and unwilling to speak, but then told Sergeant Nathaniel Lloyd he had been in a fist fight and "knocked out the homeboy," who then stabbed him. Getchey identified the person who stabbed him as "Grumpy," appellant's street name. The officer detected a moderate smell of alcohol on Getchey during their conversation, but would not describe him as definitely under the influence. Getchey did not have slurred speech, and his pupil size, possibly indicating drug use, did not catch the officer's attention.

On cross-examination, Getchey's blood-alcohol level was shown to have been .207, and in light of Getchey's admission at trial that he had used methamphetamine and cocaine at the time of the event, Sergeant Lloyd stated that both of those could have contributed to Getchey's excitability at the time of the traffic stop.

An ambulance took Getchey to the hospital. He was found to be coherent and responsive upon arrival. Getchey suffered significant blood loss and was eventually

4.

intubated and received numerous units of blood. The knife had nicked an artery in Getchey's rib cage, an injury requiring Getchey be airlifted for surgery. Getchey suffered from a compromised lung and struggled to walk, move and breathe for six months.

Later in the investigation, Sergeant Lloyd suspected that the individual Getchey had knocked out was Barragan. During a law enforcement search of Fearn's residence, Barragan was located with injuries to his hands consistent with fighting. He also had some light scratches to his face.

*Defense*

Appellant called one witness in his defense, a paramedic, who testified that Getchey told him he had been stabbed while walking home.

**DISCUSSION**

I.      NO ERROR IN FAILING TO INSTRUCT ON THEORIES OF SELF-DEFENSE/DEFENSE OF OTHERS

Appellant contends first that the trial court erred when it failed to sua sponte instruct on self-defense and defense of others. We disagree.

*Background*

At the jury instruction conference, the trial court stated that it found it appropriate to instruct on CALCRIM No. 603, the lesser included offense for count 1, attempted voluntary manslaughter based on heat of passion, but was not inclined to give CALCRIM No. 604, attempted voluntary manslaughter based on imperfect self-defense, as requested by the defense. The trial court stated it did not see there was sufficient evidence to show appellant was acting "in any sort of imperfect self-defense capacity." The trial court asked defense counsel to "articulate anything he wants, why it should be given."

Defense counsel expressed an intention to proceed on a theory of "the defense of others, not necessarily self-defense." As argued by counsel:

> "It is evidence the testimony regarding Emma Fearn coming out with a baseball bat which she claimed she used to strike Patrick Hull but she then

5.

said, I don't know how that bat got away from me. There was evidence that she lied to the police about the role of Isaias Barragan, who she initially denied even being present, that she lied about other things about Barragan because of her personal relationship with him. And so I believe there's a reasonable inference that it was Barragan … who took the bat from her and Barragan who was striking Patrick Hull and Barragan who could have struck other people involved in the altercation with this deadly weapon, to wit, a bat. Whoever the perpetrator was acted in an imperfect defense of others by using a knife."

As for CALCRIM No. 925 (Battery), the trial court noted the defense had also requested a paragraph in the instruction on battery instruction be given requiring the People to prove appellant did not act in self-defense in the commission of the battery. Defense counsel agreed that his argument as to CALCRIM No. 925 was the same as the one for CALCRIM No. 604.

The trial court then stated that its ruling as to CALCRIM No. 925 "stands on that as well," as any evidence to support such an instruction was based on "pure speculation" and it did not see "sufficient facts to push it into the self-defense mode."

*Appellant's Contention*

Appellant contends that the trial court should have given instructions on the defense of others on all three counts, specifically: (1) on count 1, the instruction that perfect self-defense is a complete defense to attempted murder (CALCRIM No. 505); and (2) on counts 2 and 3, that the absence of self-defense is an element of aggravated assault and aggravated battery (CALCRIM Nos. 875 & 925), along with the "non-homicide self-defense instruction (CALCRIM No. 3470)."[2] Of the instructions appellant argues should have been given, only CALCRIM No. 925 was requested by counsel. Appellant contends, however, that "this is of no import," as trial counsel "clearly articulated 'the

---

[2]    Appellant does not contest the failure to give the requested CALCRIM No. 604, attempted voluntary manslaughter based on imperfect self-defense, the lesser included offense of count 1, as he was found not guilty of attempted murder but of attempted voluntary manslaughter based on heat of passion. As such, he states "the trial court's failure to instruct on imperfect self-defense is not relevant here."

6.

defense of others' as a defense theory as to all three counts" and "his specific requests made it clear to the trial court that he was broadly seeking jury instruction on that theory."

*Applicable Law and Analysis*

"A trial court must instruct the jury on general principles of law necessary for the jury's understanding of the case." (*People v. Ramirez* (2019) 40 Cal.App.5th 305, 307.) As part of that duty, the court has a sua sponte duty to instruct on defenses relied upon by the defendant or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.) The trial court does not have a duty to give instructions based solely on conjecture and speculation. (*People v. Young* (2005) 34 Cal.4th 1149, 1200.) " 'Errors in jury instructions are questions of law, which we review de novo.' " (*People v. Fenderson* (2010) 188 Cal.App.4th 625, 642.) An appellate court cannot set aside a judgment on the basis of instructional error unless, after an examination of the entire record, the court concludes that the error has resulted in a miscarriage of justice. (*Ibid*; Cal. Const., art. VI, § 13.)

For an attempted killing to be in self-defense, the defendant must actually believe in the need to defend. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082; *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1232.) There are two types of self-defense under California law: perfect or imperfect. (*People v. Randle* (2005) 35 Cal.4th 987, 994.) "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury." (*Ibid.*) A bare fear of the danger is not enough—"the circumstances must be sufficient to excite the

fears of a reasonable person, and the party [attempting to] kill[ ] must have acted under the influence of such fears alone." (§ 198; see *People v. Flannel* (1979) 25 Cal.3d 668, 675.) When someone kills another in perfect self-defense, "such a killing is not a crime." (*People v. Elmore* (2014) 59 Cal.4th 121, 134.)

Imperfect self-defense requires evidence showing the defendant attempted to kill another person " 'because the defendant *actually*, but *unreasonably*, believed he was in imminent danger of death or great bodily injury ....' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048, first italics in original, second italics added.) In contrast to perfect self-defense, imperfect self-defense is not a true affirmative defense; it is shorthand for one form of voluntary manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 200.)

"The subjective elements of [perfect] self-defense and imperfect self-defense are identical[,]" and under each theory the defendant "must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) Neither perfect nor imperfect self-defense may be "invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Also, for either type of self-defense to apply, "the fear must be of imminent harm." (*People v. Humphrey, supra,* 13 Cal.4th at p. 1082.) A fear of future harm will not suffice no matter how great the fear and likelihood of harm. (*People v. Landry* (2016) 2 Cal.5th 52, 97–98; *People v. Manriquez* (2005) 37 Cal.4th 547, 581–582.)

*Perfect Defense of Others Instruction*

Appellant contends the trial court erred by failing to give the jury an instruction on perfect self-defense, defense of others. He argues the trial court had a sua sponte duty to give such an instruction because there was substantial evidence that defendant acted in

defense of others on his "team." (See *People v. Breverman, supra,* 19 Cal.4th at p. 157.) We disagree.

As stated above, for perfect self-defense, defense of others, the defendant must actually and reasonably believe that someone else is in imminent danger of being killed or suffering great bodily injury and that the immediate use of deadly force is necessary to defend against that danger. The defendant must also use no more force than was reasonably necessary to defend against that danger. (See CALCRIM No. 505, Justifiable Homicide; Self-Defense or Defense of Another.) And a defendant cannot invoke perfect self-defense/defense of others if he is the one who escalates a confrontation from one involving non-lethal force to one involving lethal force. (*People v. Clark* (1982) 130 Cal.App.3d 371, 380 ["deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury"], abrogated on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

Here, there was no substantial evidence to support such an instruction. Getchey did not provoke or otherwise instigate the fight, and there is evidence that appellant was at Fearn's house uninvited and armed with a knife, intending to be part of provoking a violent altercation. When Getchey initially tried to intervene in the fight, appellant told him to "stay out of it" and tried to "go around" Getchey and continue fighting with Barragan and Hull. Getchey was trying to protect Barragan from "getting stabbed or jumped" and admitted at trial that he had testified at the preliminary hearing that he "ended up getting stabbed for trying to stop that." Getchey testified that, had he "stayed out of it", he would not have gotten stabbed. Even if, as appellant contends, he acted in response to being "knocked out" by Getchey[3], appellant's use of deadly force was still

---

[3] One officer testified Getchey "talked about that he had been involved in a fist fight and that he had knocked out the homeboy during this fight or he had knocked him out, and then as he did that, his homeboy, so the person that he had been fighting with, had stabbed him."

unjustified and unreasonable. A defendant is only justified in using a level of force "necessary to self defense." (*People v. Mesa* (1932) 121 Cal.App. 345, 350.) On this record, any subjective belief in the need to use deadly force against Getchey was not reasonable.

There is a further reason why the trial court was not required to sua sponte instruct on perfect self-defense/defense of others. Appellant presented no defense that he ever reasonably believed Getchey, who was unarmed, posed an immediate threat to him or anyone else.[4] While a defendant is obviously not required to take the stand at trial in order to establish the existence of his actual belief in the need to use deadly force to defend others (see e.g., *People v. De Leon* (1992) 10 Cal.App.4th 815, 824), there still "must be evidence from which the jury could find that appellant actually had such a belief." (*People v. Viramontes, supra,* 93 Cal.App.4th at p. 1262.) Here, for the reasons explained above, there is no evidence appellant subjectively believed he needed to defend his "team."

We find no error on the part of the trial court in failing to instruct on perfect self-defense, defense of others, and reject appellant's claim to the contrary.

II.     CONVICTIONS ON ASSAULT WITH A DEADLY WEAPON AND BATTERY WITH SERIOUS BODILY INJURY DO NOT VIOLATE SECTION 954

Aside from being found guilty of attempted murder, appellant was also found guilty as charged in count 2 of assault with a deadly weapon (§ 245, subd. (a)(1)), with an enhancement for personally inflicting great bodily injury (§ 12022.7, subd. (a)), and in count 3 of battery with serious bodily injury (§ 243, subd. (d)), both arising out of the

---

[4]     Appellant's defense at trial questioned the identity of the perpetrator and, if appellant was the perpetrator, he was not guilty of attempted murder. Counsel also questions the credibility of Getchey, Fearn and Mendiola. The defense called one witness, a paramedic, who testified Getchey told him he had been stabbed while walking home.

same incident.  The trial court sentenced appellant to 25 years to life plus four years on the attempted murder, and stayed the assault and battery sentences.

Appellant contends the count 2 and 3 crimes are two different statements of the same offense, barred by section 954, and we should therefore remand for the trial court to strike either count 2 or 3.  We disagree.

Section 954 provides, in relevant part, that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts.…  The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged.…"[5]  (§ 954; see *People v. Vidana* (2016) 1 Cal.5th 632, 649 (*Vidana*).)  One of section 954's objectives is to assist in a "just administration of the criminal law" — for instance, one trial involving multiple charges alleged in a single accusatory pleading would obviate the need for "another trial of the same facts with its attendant trouble and expense" on any withheld charges.  (*People v. Piner* (1909) 11 Cal.App. 542, 547; see *People v. Sloan* (2007) 42 Cal.4th 110, 122 [explaining "legitimate future use of multiple convictions" pursuant to § 954].)

However, our Supreme Court has stated that section 954 " 'does not permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.' "  (*Vidana, supra,* 1 Cal.5th at p. 650.)  Put another way, " 'if a defendant cannot be convicted of a greater and a lesser included offense based on

---

[5]      While a defendant may be properly convicted of different offenses based on the same act, he or she may be punished for only one of those offenses.  (§ 654; see *People v. Jones* (2012) 54 Cal.4th 350, 358 ["Section 654 prohibits multiple punishment for a single physical act that violates different provisions of law."].)  Section 654 is not at issue here as both sentences for counts 2 and 3 were stayed.

11.

the same act or course of conduct, dual convictions for the same offense based on alternate legal theories would necessarily be prohibited.' " (*Ibid.*)

Whether statutory offenses charged in an accusatory pleading "define different offenses or merely describe different ways of committing the same offense properly turns on the Legislature's intent in enacting these provisions, and if the Legislature meant to define only one offense, we may not turn it into two." (*People v. Gonzalez* (2014) 60 Cal.4th 533, 537–540 (*Gonzalez*) [oral copulation of intoxicated person and oral copulation of unconscious person are different offenses]; see *People v. White* (2017) 2 Cal.5th 349, 354–359 [rape of intoxicated person and rape of unconscious person are different offenses]; accord, *Vidana, supra,* 1 Cal.5th at pp. 637, 647–649 [grand theft by larceny and grand theft by embezzlement are different statements of same offense].)

To determine such intent under the section 954 framework, we do not employ traditional principles of statutory interpretation, which are designed to ascertain the meaning of an ambiguous statute. Here, we must resolve any uncertainty about what the Legislature intended when it statutorily enacted assault with a deadly weapon and battery causing great bodily injury, i.e., whether it intended to define two different offenses or two different ways of committing the same offense. (See *Vidana, supra,* 1 Cal.5th at p. 637; *Gonzalez, supra,* 60 Cal.4th at p. 537.) To that end, we consider the text and structure of the statutes; the elements of the two offenses; their prescribed punishments; and other indicia of legislative intent, including legislative history and the wider historical context of the statutes' enactment to resolve the question. (See *Vidana*, at pp. 637–647; *Carmack v. Reynolds* (2017) 2 Cal.5th 844, 850.) None of these individual factors is necessarily dispositive. (*Vidana*, at p. 648.) With these guiding principles in mind, we begin our analysis of the question before us by examining the statutory language of assault with a deadly weapon and battery which causes serious bodily injury.

In 1872, the California Legislature enacted sections 240, 242, and 245.

12.

Section 240 defines assault as "an unlawful attempt, coupled with the present ability, to commit a violent injury on the person of another." Section 242 defines battery as "any willful and unlawful use of force or violence upon the person of another." These two offenses are misdemeanors, an assault being punishable by a fine not exceeding $1,000 or by imprisonment in the county jail not exceeding six months, or both (§ 241, subd. (a)); battery being punishable by a fine not exceeding $2,000, or imprisonment in the county jail not exceeding six months, or by both (§ 243, subd. (a)).

Section 245, also enacted in 1872, is a felony offense. It proscribes in part, the assault upon another person with a deadly weapon or instrument other than a firearm, or by means of force likely to produce great bodily injury. A violation of section 245 is punishable by imprisonment in the state prison for two, three or four years, or in a county jail not exceeding one year, or by fine not exceeding $10,000, or by both fine and imprisonment. (§ 245, subd. (a)(1).)

It was not until 1975 that the Legislature amended section 243 to provide for increased punishment for the commission of a battery which causes serious bodily injury. Pursuant to section 243, subdivision (d), a battery which causes serious bodily injury is punishable by imprisonment in the county jail for a period of not more than one year or imprisonment in the state prison for two, three or four years. (§ 243, subd. (d).)

It is well settled that an assault is an attempt to commit a battery (*In re James M.* (1973) 9 Cal.3d 517, 521; *People v. Rocha* (1971) 3 Cal.3d 893, 899), and that battery is simply a consummated assault (*People v. Glover* (1967) 257 Cal.App.2d 502, 506.) Whenever an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense, and the accused cannot be convicted for both. (*People v. Rocha* (1978) 80 Cal.App.3d 972, 975; *People v. Greene* (1973) 34 Cal.App.3d 622, 654.) Since every completed battery includes an assault, assault is an included offense of battery. (*In re Ronnie N.* (1985) 174 Cal.App.3d 731, 734.)

13.

However, the relationship of simple assault and battery is not analogous to assault with a deadly weapon or with force likely to produce great bodily injury and battery inflicting serious bodily injury. As stated in *People v. Bertoldo* (1978) 77 Cal.App.3d 627, a "felony battery is not necessarily encompassed by aggravated assault. Section 245, subdivision (a), specifically addresses the conduct of a defendant by prohibiting an attack upon another person. In contrast, section 243 addresses the result of conduct rather than proscribing specific conduct. Thus, one may conceivably commit a felony battery without committing an aggravated assault. For example, a push that results in a fall and concomitant serious injury may not be sufficient deadly force to permit successful prosecution under section 245, subdivision (a). However, it is triable as a felony battery." (*Bertoldo, supra,* at pp. 633–634.) Thus, because a battery inflicting serious injury could occur without necessarily using a weapon or force *likely* to cause such serious injury, aggravated assault (a violation of § 245, subd. (a)) is not a lesser included offense of battery causing serious injury (a violation of § 243, subd. (d).)

Appellant argues that the great bodily injury enhancement with the aggravated assault creates an overlapping element with the serious bodily injury element to battery. Specifically, that an assault is an attempt to commit battery, and when aggravated assault successfully inflicts great bodily injury, battery inflicting serious bodily injury has necessarily been committed. However, the great bodily injury enhancement is not considered an element of the aggravated assault under section 954. A section 954 analysis is limited to "the elements of the offenses charged." (*In re Jose H.* (2000) 77 Cal.App.4th 1090, 1095.) The enhancement is not an element for section 954 purposes and therefore does not create an overlapping element between the two offenses.

To determine whether one statutory provision describes the same offense as another such that conviction on both offenses would be barred, the Supreme Court first considers whether the two provisions have the same elements or one is a lesser included offense of the other (*People v. White, supra,* 2 Cal.5th at p. 357 [noting of section 261,

14.

subd. (a)(3) and (4)(A), " 'neither offense is included within the other' "]; *Vidana, supra,* 1 Cal.5th at p. 648 ["Larceny and embezzlement have different elements and neither is a lesser included offense of the other"]; *Gonzalez, supra,* 60 Cal.4th at p. 539 [noting of section 288a, subds. (f) and (i), "neither offense is included within the other"].) The Supreme Court also examines the two provisions' textual structure. (*Gonzalez,* at p. 539.)

We have done both here — determined that one offense is not included within the other and examined the two provisions' textual structure. However, the test for whether two provisions are statements of the same offense depends ultimately on legislative structure and intent. The only way assault with a deadly weapon is a statement of the same offense as battery causing serious bodily injury would be if there were some indication in section 245 or section 243's structure, historical context, or legislative history that the Legislature intended this result.

Appellant has provided us with no indication of this intent and we have found none. As discussed above, assault with a deadly weapon and battery causing serious bodily injury are different offenses, described in different statutes, with different statutory schemes and definitions. Battery is encompassed in sections 242 through 243.15. When originally enacted in 1872, battery was defined in section 242, with punishment set forth in section 243. As the Legislature added to the statutory scheme related to battery, it confined those additions to section 243. Assault is addressed separately in sections 244 through 245.5. Like battery, additions to the statutory scheme for assault were confined to sections 244 and 245.

Cases which have found separate charges constituting the same offense have included charges within the same statute, or charges that were previously in the same statute. (*People v. Aguayo* (2022) 13 Cal.5th 974 [considering assault with a deadly weapon and force-likely assault, both offenses under § 245]; *Gonzalez, supra,* 60 Cal.4th 533 [considering oral copulation of an unconscious person (§ 288a, subd. (f)) and oral

copulation of an intoxicated person (§ 288, subd. (i))]; *People v. Ryan* (2006) 138 Cal.App.4th 360 [considering whether forgery under § 470, subd. (a), and also subd. (d) as two separate charges constituting two separate offenses]; *Vidana, supra,* 1 Cal.5th 632 [considering grant theft by larceny (§ 484) and embezzlement (§ 503) which have previously been consolidated into the same offense].)

The assault with a deadly weapon (§ 245, subd. (a)(1)), with an enhancement for personally inflicting great bodily injury (§ 12022.7, subd. (a)), and battery with serious bodily injury (§ 243, subd. (d)) offenses charged here are two distinct offenses, and we reject appellant's claim to the contrary.

III.     NO ERROR IN TRIAL COURT'S IMPOSITION OF ENHANCEMENTS

Appellant was charged with various enhancements, which the jury found true — as to each count, that he personally used a deadly weapon or knife in the commission of the offense (§ 12022, subd. (b)(1)), and that he personally inflicted great bodily injury (§ 12022.7, subd. (a)).  In a bifurcated trial, the jury found true that appellant had suffered two prior strike convictions (§§ 667, subds. (c)–(j) & 1170.12, subds.(a)–(e)) and two serious felony priors (§§ 667, subd. (a))

At sentencing, defense counsel argued, pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) and section 1385 that one of appellant's prior strikes was more than five years old and requested that this strike be stricken, as well as the two section 667, subdivision (a) five-year enhancements.  The trial court denied the *Romero* motion, citing appellant's "propensity towards violence," but struck the section 667, subdivision (a) enhancements.  Appellant did not request that either the section 12022.7, subdivision (a) or the section 12022, subdivision (b)(1) enhancements be stricken.

Appellant was sentenced to a total of 29 years to life: a third strike sentence of 25 years to life for count 1; one year for the section 12022, subdivision (b)(1) deadly weapon

enhancement; and three years for the section 12022.7, subdivision (a) great bodily injury enhancement.

Appellant now alleges that all enhancements beyond a single enhancement must be stricken in accordance with the unambiguous plain language of section 1385(c)(2)(B), "i.e., two of the following: the prior strike enhancement (§§ 667, subd. (d), 1170.12, subd. (b)), the deadly weapon enhancement (§ 12022, subd. (b)(1)), and the great bodily injury enhancement (§ 12022.7, subd. (a))." We disagree, as explained below, but note first that appellant's reference to section 667, subdivision (d), which we assume is a reference to his 2014 strike, is not an enhancement within the meaning of section 1385. (See *People v. Burke* (2023) 89 Cal.App.5th 237, 243 [it is "well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense."].) As such, we address his issue only as to the section 12022, subdivision (b)(1) and section 12022.7, subdivision (a) enhancements.

### *No Forfeiture of Mandatory Dismissal Claim*

As an initial matter, the People contend appellant forfeited this claim because he did not argue below that section 1385(c)(2)(B) requires dismissal of all but one enhancement.

"As a general rule, a criminal defendant who fails to object at trial to a purportedly erroneous ruling forfeits the right to challenge that ruling on appeal." (*People v. Anderson* (2020) 9 Cal.5th 946, 961.) There are exceptions to this rule, however, including for an unauthorized sentence. (*In re Sheena K.* (2007) 40 Cal.4th 875, 886.) "The unauthorized sentence doctrine is designed to provide relief from forfeiture for 'obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings.' [Citation.] It applies when the trial court has imposed a sentence that 'could not lawfully be imposed under any circumstance in the particular case.' " (*People v. Anderson, supra*, at p. 962.)

17.

Appellant's claim that section 1385(c)(2)(B) mandates dismissal of all but one of the imposed enhancements is an assertion the sentence is unauthorized. If section 1385(c)(2)(B) obligates the trial court to dismiss all but one the enhancements and the trial court failed to do so, then the resulting sentence imposing all the enhancements was not one that could be legally imposed under any circumstance. This claim represents an exception to the forfeiture doctrine, and we shall consider it. (*People v. Anderson* (2023) 88 Cal.App.5th 233, 239, fn. 7 (*Anderson*), review granted Apr. 19, 2023, S278786.)

*Applicable Law*

Pursuant to Senate Bill No. 81 (2021–2022 Reg. Sess.), section 1385, subdivision (c) now provides in relevant part: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so .... [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others. [¶] ... [¶] (4) The circumstances listed in paragraph (2) are not exclusive and the court maintains authority to dismiss or strike an enhancement in accordance with subdivision (a)." (§ 1385, subd. (c).)

The nine mitigating circumstances in subparagraphs (A) to (I) of section 1385, subdivision (c)(2) provide as follows:

> "(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

> "(B) Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement *shall be dismissed.*

18.

"(C) The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement *shall be dismissed.*

"(D) The current offense is connected to mental illness.

"(E) The current offense is connected to prior victimization or childhood trauma.

"(F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5.

"(G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.

"(H) The enhancement is based on a prior conviction that is over five years old.

"(I) Though a firearm was used in the current offense, it was inoperable or unloaded."  (§ 1385, subd. (c)(2)(A)–(I), italics added.)

Multiple Courts of Appeal have interpreted section 1385, subdivision (c)(2) and concluded the *shall be dismissed* language included in section 1385(c)(2)(B), as well as in section 1385, subdivision (c)(2)(C) (hereafter § 1385(c)(2)(C)), does not *mandate* dismissal of any enhancements.  (*People v. Walker* (2022) 86 Cal.App.5th 386, 396–398, review granted Mar. 22, 2023, S278309 (*Walker*) [purpose of § 1385, subd. (c) is to give trial court discretion to dismiss enhancements];  *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 17–21 (*Lipscomb*) [" 'shall be dismissed' " language in § 1385(c)(2)(C) does not require dismissal of an enhancement whenever a sentence over 20 years may result]; *Anderson, supra,* 88 Cal.App.5th at p. 239, review granted [language in § 1385 that trial court " 'shall' " dismiss an enhancement is conditioned on finding dismissal is in the interest of justice]; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 294-297 (*Mendoza*) [court is not required to dismiss an enhancement under § 1385(c)(2)(C) if it would endanger public safety].)

As explained in *Walker*, section 1385(c)(2)(B)'s phrase " 'all enhancements beyond a single enhancement shall be dismissed' " cannot be considered in isolation but must be considered in the context of the statute as a whole. (*Walker, supra,* 86 Cal.App.5th at pp. 396–397, review granted.) The phrase is "not a standalone mandate of section 1385." (*Id.* at p. 397.) Instead, it is listed among nine mitigating circumstances, which, under section 1385 subdivision (c)(1) and (2), are to weigh greatly in favor of dismissal as the court is exercising its discretion to determine whether dismissal is in the furtherance of justice. (*Walker, supra*, at p. 397.) "If we were to read the phrase appended to the multiple enhancements mitigating factor as *automatically* mandating dismissal of all but one enhancement whenever multiple enhancements exist, then the existence of multiple enhancements would not 'weigh greatly' in favor of dismissal—it would weigh *dispositively.* But that is not what the statute says, and we are not allowed to rewrite the statute." (*Ibid.*)

The court in *Lipscomb* similarly concluded that a trial court is not required to strike an enhancement under section 1385(c)(2)(C) where that mitigating circumstance is present. Like *Walker*, the *Lipscomb* court refused to read in isolation the *shall be dismissed* language in section 1385(c)(2)(C) and instead considered the statute as a whole. (*Lipscomb, supra,* 87 Cal.App.5th at p. 18.) The court pointed out the language in section 1385(c)(2)(C) had to be read in concert with section 1385(c)(2)(C)'s identification of mitigating circumstances and its provision that the court is to exercise its *discretion* to dismiss an enhancement. As the trial court had expressly found dismissing the enhancement would endanger public safety, the trial court was not required to consider and afford great weight to the mitigating circumstance under section 1385(c)(2)(C). (*Lipscomb, supra*, at p. 18.)

*Anderson*, likewise, reasoned "the statement that a court 'shall' dismiss certain enhancements appears as a subpart to the general provision that a 'court shall dismiss an enhancement *if* it is in the furtherance of justice to do so.' (§ 1385, subd. (c)(1) , italics

added.)  In other words, the dismissal of the enhancement is conditioned on a court's finding dismissal is in the interest of justice." (*Anderson, supra,* 88 Cal.App.5th at p. 239, review granted.)  The language, taken together, means that "the trial court has discretion to dismiss sentencing enhancements; certain circumstances weigh greatly in favor of dismissal; and a finding of danger to public safety can overcome the circumstances in favor of dismissal." (*Ibid.*)  *Anderson* explained the *shall be dismissed* language in section 1385(c)(2)(B) means that "dismissal *shall* occur but only *if*, in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice or would not endanger public safety." (*Anderson, supra*, at p. 240.)

*Mendoza*, too, concluded that the *shall be dismissed* language in section 1385(c)(2)(C) "applies only if the court does *not* find that dismissal of the enhancement would endanger public safety.  That interpretation gives meaning to the language in section 1385(c)(2)  requiring the court to consider whether dismissal 'would endanger public safety,' and it consequently avoids rendering that language surplusage." (*Mendoza, supra,* 88 Cal.App.5th at p. 296.)

Analysis

Appellant argues *Walker* and the "appellate cases that have weighed in on this issue thus far" were wrongly decided because their statutory analyses are flawed. Appellant argues that, while *Walker* was correct to recognize that the plain language of the statue is unambiguous, it erred in going "beyond this unambiguous plain language" and consider where it fits into the context of the statute as a whole.  (Citing *Walker, supra,* 86 Cal.App.5th at p. 396.)  Appellant contends the statutory language is clear and unambiguous that there is no need for judicial construction.

In construing statutory language, a court's fundamental task " 'is to determine the Legislature's intent to effectuate the law's purpose, giving the statutory language its plain and commonsense meaning.  We examine that language, not in isolation, but in the

context of the statutory framework as a whole to discern its scope and purpose and to harmonize the various parts of the enactment. [Citation.] "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] The wider historical circumstances of a law's enactment may assist in ascertaining legislative intent, supplying context for otherwise ambiguous language.' " (*People v. Prudholme* (2023) 14 Cal.5th 961, 975-976.)

We agree with *Walker, Lipscomb, Anderson* and *Mendoza* in their construction of the *shall be dismissed* language in section 1385(c)(2)(B) and (C). When this language is read in the context of the whole statute, dismissal of an enhancement is not mandatory when the circumstances under section 1395(c)(2)(B) or (C) are present. Appellant's contrary interpretation would strip the trial court of any power to weigh these two mitigating circumstances as required under section 1385, subdivision (c)(2) — under appellant's interpretation, the presence of either one would *dispositively* require dismissal of one or more enhancements. (*Walker, supra*, 88 Cal.App.5th at p. 396, review granted.) And, it would negate the trial court's consideration of public safety or whether dismissal is in the furtherance of justice as required under section 1385, subdivision (c)(1) and (2). (See *Mendoza v. Nordstrom, Inc.* (2017) 2 Cal.5th 1074, 1087 [The Legislature "does not engage in idle acts, and no part of its enactments should be rendered surplusage if a construction is available that avoids doing so"].)

Appellant argues that it would strain credulity for the People to argue that the plain language of section 1385(c)(2)(B) is the result of a drafting error. This provision was added to section 1385 in 2021, when the Legislature enacted Senate Bill No. 81. (Stats. 2021, ch., 721, § 1.) Appellant points out that the Legislature amended section 1385 again in 2022 (Assem. Bill No. 200 (2021–2022 Reg. Sess.)), and it did not amend

22.

the *shall be dismissed* language in section 1385(c)(2)(B) or (C). Appellant maintains these circumstances indicate the Legislature intended the *shall be dismissed* language to be mandatory because it decided to retain the language despite a proposed bill seeking to remove it.

We are unpersuaded. Even assuming appellant's proffered interpretation of the statute is reasonable and presents an ambiguity such that resort to extrinsic interpretive aids such as legislative history is relevant, the Legislature may have elected not to amend the language in section 1385(c)(2)(B) and (C) for a variety of reasons. Its declination to do so is equally suggestive of an alternative assumption: it was satisfied the statute as a whole did not signal that dismissal of enhancements was mandatory under section 1385(c)(2)(B) and (C), and thus it concluded amendment of these provisions was unnecessary, including as proposed under Assembly Bill No. 931. (See *Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 439 [" '[w]e rely on the legislative history of an ambiguous statute as dispositive only when that history is itself unambiguous' "].)

Moreover, if the statute were reasonably susceptible to two constructions, one being appellant's proffered interpretation and the other being that articulated by the Courts of Appeal identified above, we must adopt the construction that is reasonable and does not produce absurd consequences. (See *Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 925; accord *People v. Jenkins* (1995) 10 Cal.4th 234, 246.) Section 1386(c)(2)(B) and (C) specifically directs that the court is not required to dismiss an enhancement if it finds that dismissal would "endanger public safety." (§ 1385, subd. (c)(2).)

Appellant's interpretation would require mandatory dismissal of one or more enhancements under section 1385(c)(2)(B) and (C) even if it endangered public safety to do so. This is at odds with the language of section 1385, subdivision (c)(2), and it would lead to absurd results. (*Mendoza, supra,* 88 Cal.App.5th at p. 296 [mandatory dismissal

23.

without considering public safety would require the sentencing court to endanger public safety, a result the Legislature could not have intended].)

Here, in denying appellant's *Romero* motion, the trial court identified multiple circumstances that described how appellant is a danger to public safety. It found appellant "clearly demonstrated a propensity for violence against others and has a significant track record that has demonstrated that from when he was a juvenile … through this case, and that to me, in this Court's mind, justifies the use of a strike" in denying appellant's request. In addition, the jury found true multiple aggravating factors in support of the trial court's decision to impose the upper term, including that the crime involved great violence and bodily harm and "indicates a serious danger to society," and that appellant was on probation at the time of the current crime.

While these findings were not made specifically in consideration of section 12022, subdivision (b)(1) and section12022.7, subdivision (a), the pertinent issue was addressed: whether there is a likelihood that dismissing one of the enhancements would endanger public safety. The trial court explicitly found that it would, justifying the greater sentence.

In sum, section 1385(c)(2)(B) does not *mandate* dismissal of all but one enhancements found true by the jury, and the trial court did not err by declining to do so.

IV.    FORFEITURE ON TRIAL COURT'S IMPOSITION OF FINES AND ASSESSMENTS

Finally, appellant contends that the trial court improperly ordered him to pay fines, fees and assessments without first assessing his ability to pay, violating his due process rights.

The fines and assessments imposed by the court in sentencing appellant included a $300 restitution/suspended revocation fine (§§ 1202.4, 1202.45), a $40 court operations

assessment for each count, for a total of $120 (§ 1465.8), and a $30 criminal conviction assessment for each count, totaling $90 (Gov. Code, § 70373).[6]

Appellant contends the case should be remanded to allow him the opportunity to request a hearing and demonstrate he is indigent and unable to pay the fine and assessments imposed by the trial court under the decision in *People v. Duenas* (2019) 30 Cal.App.5th 1157 (*Duenas*). In *Duenas,* the court found it violates due process under both the United States and California Constitutions to impose a court operations assessment as required by section 1465.8 or the court facilities assessment mandated by Government Code section 70373, neither of which is intended to be punitive in nature, without first determining the convicted defendant's ability to pay. (*Duenas,* at p. 1168.)

A restitution fine under section 1202.4, subdivision (b), in contrast, is intended to be, and is recognized as, additional punishment for a crime. Section 1202.4, subdivision (c), provides a defendant's inability to pay may not be considered a compelling and extraordinary reason not to impose the restitution fine; inability to pay may be considered only when increasing the amount of the restitution fine above the minimum required by statute.[7]

To avoid the serious constitutional question raised by these provisions, *Duenas* held, although the trial court is required to impose a restitution fine, the court must stay execution of the fine until it is determined the defendant has the ability to pay it. (*Duenas, supra,* 30 Cal.App.5th at p. 1172.)

The People contend appellant forfeited his right to an ability-to-pay hearing. We agree. Although courts have repeatedly observed that *Duenas* announced a constitutional

---

[6]     The People note that, at sentencing the trial court mistakenly ordered the section 1465.8 fine for count 3 in the amount of $45 instead of $40. The People ask that "this court order the fee be reduced to $40." However, we note that the correct total of the fine for section 1465.8 of $120 (3 times $40) is correct on the abstract of judgment.

[7]     It is of note here that the $300 imposed section 1202.4 restitution is the statutory minimum.

principle that could not have been reasonably anticipated (see, e.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 489), the *Duenas* opinion was filed January 8, 2019, and appellant was not sentenced until November 17, 2022, almost four years later. Appellant's failure to request a hearing or otherwise raise any question concerning his ability to pay assessments, fines or fees in the court forfeits the issue on appeal.

## DISPOSITION

The judgment is affirmed.

FRANSON, J.

WE CONCUR:

DETJEN, ACTING P. J.

SMITH, J.